625 N.W.2d 533 (2001)
2001 ND 83
In the Interest of C.R.C., a child.
Charles R. Sheeley, Richland County Juvenile Supervisor, Petitioner and Appellee,
v.
C.R.C., a child; C.A.M.C., and S.B., parents of said child, Respondents.
C.A.M.C., Respondent and Appellant.
No. 20000286.
Supreme Court of North Dakota.
May 1, 2001.
*535 Ronald W. McBeth (on brief), Assistant State's Attorney, Wahpeton, ND, for appellee.
Janel B. Fredericksen (on brief), Wahpeton, ND, for appellant.
KAPSNER, Justice.
[¶ 1] C.A.M.C. ("Connie")[1] appeals from a juvenile court order terminating her parental rights to C.R.C. ("Courtney"), age 7. We conclude the evidence is clear and convincing that Courtney is a deprived child; the conditions and causes of deprivation are likely to continue or will not be remedied; and Courtney is suffering, or will probably suffer, serious physical, mental, moral, or emotional harm from the deprivation if Connie's parental rights are not terminated. We affirm.

I
[¶ 2] In 1994, Courtney was born to Connie and S.B. ("Steve"), who were never married. Later that year, Connie married another man, S.M. ("Simon"), and they had two children together. From March to July 1996, Courtney was placed in foster care in Wilkin County, Minnesota, after police responded to a domestic violence report. From August 1996 to July 1997, Courtney was again placed in foster care in Wilkin County when Connie was arrested and taken to a treatment center. After Connie and Simon moved to Traverse County, Minnesota, Child Protection Services conducted a child protection risk assessment, concluding Connie's children were at a high risk of abuse or neglect and were hungry, not toilet trained, and smelled; Courtney had bruises and unexplained injuries; animal feces were left on the floor in the house; the parents had poor home management skills; and the children were not properly supervised and received no affection. Subsequently, Connie and Simon voluntarily entered a Child Protection Service Plan, but the agency found little to no visible progress after four months. In September 1998, Connie voluntarily placed Courtney with the child's paternal aunt.
[¶ 3] In November 1998, Connie's second child was placed in foster care, where he remained until parental rights were terminated. In July 1999, Connie divorced Simon and became romantically involved *536 with M.E. ("Michael"). After Connie and Michael were evicted from their apartment, Connie moved into the YMCA but had to leave after 30 days for not following the rules. Until October 1999, Courtney remained with the paternal aunt who had agreed to adopt Courtney but changed her mind when Courtney became too difficult to manage. During the time Courtney lived with her paternal aunt, visitation between Connie and Courtney was minimal, especially between May and October 1999 when there was no direct contact despite opportunities to visit. In November 1999, Richland County Social Services obtained custody of Courtney, after the juvenile court found the paternal aunt was no longer able to provide care; Connie intended to move Courtney to her residence where a sexual offender also lived; and Courtney lived outside Connie's home for the last year with few visitations. In January 2000, Connie moved in with R.S. ("Richard"), whom she married after a three-week engagement. Shortly later, Connie left Richard and started seeing Michael again, intending to live with both Richard and Michael in an efficiency apartment.
[¶ 4] In January 2000, the Richland County Juvenile Supervisor filed a petition to terminate parental rights to Courtney. Subsequently, Courtney's father, Steve, voluntarily terminated his parental rights. After a hearing, the juvenile court also terminated Connie's parental rights upon finding: (1) Courtney is a deprived child, and her deprivation was not caused by lack of financial means; (2) the deprivation is likely to continue, and Courtney will suffer serious physical, mental, moral, or emotional harm in the future; (3) Courtney was in foster care 33 months during her 70 months of age; (4) Connie visited Courtney only minimally, with no contact from May to October 1999 despite opportunities to visit; (5) Connie was unemployed but able to be employed, yet did not budget her income to pay rent and was evicted; (6) Connie was provided a variety of assistance from agencies in Minnesota and North Dakota; (7) even with the aid of government agencies, Connie would be unable to provide physical and emotional care for Courtney. Connie appeals.

II
[¶ 5] On appeal, we review juvenile court orders terminating parental rights similar to a trial de novo, by examining the files, records, and transcript of the evidence, giving appreciable weight to the juvenile court's findings. In the Interest of W.E., 2000 ND 208, ¶ 6, 619 N.W.2d 494. Although we are not bound by the juvenile court's findings, we give deference to the decision of the juvenile court, which had the opportunity to observe the demeanor and candor of witnesses. In the Interest of A.S., 1998 ND 181, ¶ 13, 584 N.W.2d 853.

III
[¶ 6] Parents have fundamental and natural rights to their children which is constitutionally protected; however, their rights are not absolute or unconditional, and parents must provide care that satisfies minimum community standards. In the Interest of L.F., 1998 ND 129, ¶ 9, 580 N.W.2d 573. Due process provides certain procedural protections before the parent-child relationship may be terminated. In the Interest of A.S., 1998 ND 181, ¶ 14, 584 N.W.2d 853. Absent abandonment or consent, termination of parental rights requires satisfaction of a three-pronged test in which the State must prove by clear and convincing evidence: (1) the child is deprived; (2) the conditions and causes of the deprivation are likely to continue or will not be remedied; and (3) the child is suffering, or will probably suffer, serious physical, mental, moral, or *537 emotional harm by reason of the deprivation. In the Interest of W.E., 2000 ND 208, ¶ 7, 619 N.W.2d 494; N.D.C.C. § 27-20-44.

A
[¶ 7] Connie argues the State failed to prove by clear and convincing evidence that Courtney is a deprived child; rather, the evidence demonstrates Connie is willing and able to provide for Courtney's care when given the opportunity and support of outside agencies. Connie claims the only testimony offered at the trial regarding observations of her parenting skills was from social services in Wilkin, Traverse, and Cass counties, but none from Richland County which initiated the termination proceedings. Connie asserts she voluntarily entered a Child Protection Service Plan in Traverse County in an attempt to keep the children in her home; however, Richland County requested termination of parental rights based on "outdated" evaluations from other counties which do not reflect that Connie made very significant changes toward being a good mother. Connie asserts the report of the guardian ad litem only refers to Courtney's problems adjusting to foster care, not as a result of her contact with her mother, and Connie and Courtney have a mother-daughter bond which should be preserved.
[¶ 8] A deprived child is defined as one who lacks proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents. N.D.C.C. § 27-20-02(8)(a); see also In the Interest of W.E., 2000 ND 208, ¶ 8, 619 N.W.2d 494.
[¶ 9] As noted by the juvenile court, the record contains significant evidence that Courtney suffered both abuse and neglect from her parents and was living in an unsuitable environment. All the social services agencies involved with this family documented continuous reports of unkempt children, domestic violence, lack of supervision, and poor parenting skills. The family service workers testified that their attempts to assist Connie with parenting skills resulted in noncompliance, as Connie would follow the service plan and checklists for a brief time and then would give up, and the family situation would deteriorate again. The family service workers testified the only way a service plan would work for Connie was to have an in-home provider every day of the week, which was not feasible and not required by law. See In the Interest of D.R., 525 N.W.2d 672, 675 (N.D.1994) ("Even if a more consistent treatment could be contrived for [the mother], the scope of the necessary increased assistance, through constant supervised care for [the mother] and her children together, would be too extravagant and is not required by law.").
[¶ 10] The juvenile court found almost half of Courtney's life was spent outside her family home, that is, she was six years old at the termination proceeding and had spent 33 months in either foster care or living with a paternal aunt. Moreover, Connie did not visit Courtney when she had the opportunity, after voluntarily placing her with a paternal aunt, and only visited after termination proceedings began. See In the Interest of A.M., 1999 ND 195, ¶ 8, 601 N.W.2d 253 (terminating parental rights after finding evidence the mother and her children had been involved with child protection services several times in other jurisdictions; the mother failed to complete treatment programs; one child had spent 35 of her first 51 months in foster care and the other child spent over one-third of her life in homes other than *538 with her parents; and the mother had only very limited and sporadic contact with the children); see also In the Interest of D.F.G., 1999 ND 216, ¶ 15, 602 N.W.2d 697 (commending a parent who needs temporary assistance for opting to place a child in the custody of social services, but stating a parent who repeatedly places a child in protective custody for several years may be unable or unwilling to provide adequate care for the child).
[¶ 11] The record also provides evidence that Courtney's deprivation was not due primarily to the lack of Connie's financial means. The juvenile court concluded Connie's money problem was not a lack of financial resources, but rather poor money management and the inability to set priorities to take care of the children. The juvenile court found Connie spent money on unnecessary expenses, yet consistently ran short of money to pay rent, which led to eviction. The record indicated Connie was provided a variety of assistance including homemaker's aides, parental counseling, intensive family counseling, and money management, but she has been unable or unwilling to improve her budgeting and parenting skills. Connie's continuing unstable lifestyle and romantic relationships are not evidence of positive changes.
[¶ 12] We conclude the evidence is clear and convincing that Courtney is a deprived child lacking proper parental care, and her deprivation is not due primarily to Connie's lack of financial means.

B
[¶ 13] Connie argues the evidence was not clear and convincing that the conditions and causes of Courtney's deprivation are likely to continue or will not be remedied. Connie asserts she has demonstrated a willingness to work with social services and should be given another chance, especially since she has made positive changes in her life by removing herself from a dysfunctional marriage. According to Connie, Richland County failed to make reasonable efforts to transfer foster care to Cass County where Connie resided or to assist her with parenting training; rather, Richland County proceeded "head first" into the termination process.
[¶ 14] In determining whether a child's deprivation is likely to continue or will not be remedied, we consider prognostic evidence as a basis for reasonable predictions about future behavior. In the Interest of S.F., 2000 ND 161, ¶ 10, 615 N.W.2d 511. Prognostic evidence includes reports and opinions of professionals. In the Interest of D.F.G., 1999 ND 216, ¶ 20, 602 N.W.2d 697. In addition, we consider the lack of parental cooperation with social service agencies, which is insufficient to establish deprivation but is pertinent to whether deprivation will continue. S.F., at ¶ 10. The amount of contact a parent has had with the child may also be considered. D.F.G., at ¶ 20.
[¶ 15] Dr. John Molstre's evaluation of Connie in March 1999 offers prognostic evidence of her future behavior. The evaluation noted Connie's "low average" mental ability and concluded:
[Connie] is a dependant [sic], isolated, vulnerable and in some respects inadequate person who is in a highly dysfunctional relationship and facing multiple stressors. The impact on her ability to parent is dramatic and I believe her ability at the present time to take care of her children is limited and at this point I do not believe that [she] can successfully raise, parent, or provide for her children nor provide a safe and nurturant home for them on a long term basis.... I believe that the prognosis for neglectful or abusive behavior towards [Courtney] is very real and that *539 [Courtney] would indeed suffer emotional and physical harm if [she] were to live with [Connie].
....
Ultimately, this is a situation that's not likely to change unless [Connie] decides to leave [Simon], and even with the change, it is unlikely that she can care for her children. Termination would appear to be in the best interest of the child.
[¶ 16] Dr. Molstre also stated his evaluation and recommendation would not change based on Connie's current lifestyle. He stated, "[I]t would suggest that the instability and the dependency and the immaturity has continued, and is basically further validated and ... would not change his opinion that [Connie's] parental rights should be terminated."
[¶ 17] Connie's lifestyle has been continuously unstable in many aspects: relationships, living arrangements, and financial matters. Connie did not name any support network on which she could rely to assist her with parenting Courtney. For over four years, social services from various counties tried to make Connie a better parent by implementing a number of services, but the agencies saw little or no progress. The testimony indicated Connie would follow a parenting plan briefly, but then relapse into previous behavior. Furthermore, Connie visited Courtney only sporadically during the year Courtney was living with her paternal aunt. See In the Interest of L.F., 1998 ND 129, ¶¶ 18-24, 580 N.W.2d 573 (finding deprivation likely to continue unremedied based on the psychologist's evaluation; failure to exercise visitation; lack of cooperation with recommended programs; and nomadic, unstable, and questionable living arrangements). Although Connie requests a second chance, we conclude she has been afforded numerous chances, and now Courtney deserves a chance at a stable environment. See In the Interest of A.S., 1998 ND 181, ¶ 29, 584 N.W.2d 853 (rejecting a mother's request for a second chance, as unfortunately the deprived child will not be given a first chance unless immediately placed in a stable environment and given what precious little time remains to create a bonding relationship).
[¶ 18] We find ample prognostic evidence demonstrating the deprivation of Courtney is likely to continue and will not be remedied unless parental rights are terminated.

C
[¶ 19] Connie argues the evidence was not clear and convincing that Courtney was suffering or will probably suffer serious physical, mental, moral, or emotional harm from her deprivation. Connie contends Courtney's physical and mental problems make it difficult for her to adapt to change and likely are the result of changes in her foster care dynamics, rather than from any deprivation involving Connie.
[¶ 20] To determine if the deprived child is suffering, or probably in the future will suffer, serious physical, mental, moral, or emotional harm, a showing of parental misconduct is insufficient without showing a resultant harm to the child from the deprivation. In the Interest of D.F.G., 1999 ND 216, ¶ 28, 602 N.W.2d 697. The deprivation is not required to be continuous, and the likelihood of serious mental and emotional harm to the child may be shown by prognostic evidence. Id. The best interests of the child is an important factor which also must be considered, although not the primary consideration in a termination proceeding. In the Interest of L.F., 1998 ND 129, ¶ 27, 580 N.W.2d 573.
*540 [¶ 21] The juvenile court found the evidence showed Courtney's development was delayed and that she suffered physically and emotionally from her deprivation. The social service assessments determined Connie's children were at a high risk of abuse or neglect, including hunger, uncleanliness, lack of supervision, and no affection. The assessments also reported Courtney had bruises and unexplained injuries. In addition to the testimony of family service workers, mental health professionals concurred in their evaluations regarding the harm Courtney has suffered and likely will continue to suffer. Dr. Geiselhart testified Courtney suffers from reactive attachment disorder caused by a lack of a secure bonding relationship with anyone. The record shows at six years of age Courtney had spent almost half of her life outside her family home with minimal visits from Connie. When Connie finally visited Courtney at the psychiatric center, Dr. Geiselhart recommended visitation cease because of Courtney's aggressive behavior following Connie's visitation, and he noted Courtney's behavior improved after Connie's visitations ceased. Courtney also told Dr. Geiselhart she did not want to see Connie again. In addition, Dr. Molstre's parental capacity evaluation reported Courtney "would indeed suffer emotional and physical harm if [she] were to live with [Connie]." Ultimately, Dr. Molstre concluded termination of Connie's parental rights would be in Courtney's best interests because it is unlikely that Connie can care for her children. See In the Interest of A.S., 1998 ND 181, ¶ 27, 584 N.W.2d 853 (emphasizing that a court need not wait for a tragic event to happen before terminating parental rights).
[¶ 22] We conclude the testimony and evaluations show Courtney has suffered and probably will suffer serious harm by reason of her deprivation.

IV
[¶ 23] Our review of the entire record demonstrates by clear and convincing evidence that Courtney is a deprived child, her deprivation is not due primarily to a lack of financial resources, the causes and conditions of her deprivation will likely continue unremedied, and Courtney is suffering or likely will suffer serious physical, mental, moral, or emotional harm. Therefore, we affirm the juvenile court's decision to terminate Connie's parental rights to Courtney.
[¶ 24] GERALD W. VANDE WALLE, C.J., and MARY MUEHLEN MARING, WILLIAM A. NEUMANN, DALE V. SANDSTROM, JJ., concur.
NEUMANN, Justice, concurring.
[¶ 25] I agree with the majority that the trial court's judgment terminating Connie's parental rights should be affirmed. I write separately to address my concern with the standard of review in juvenile cases.
[¶ 26] The majority opinion, at ¶ 5, employs the standard of review this Court has used for many years in juvenile cases:
On appeal, we review juvenile court orders terminating parental rights similar to a trial de novo, by examining the files, records, and transcript of the evidence, giving appreciable weight to the juvenile court's findings. Although we are not bound by the juvenile court's findings, we give deference to the decision of the juvenile court, which had the opportunity to observe the demeanor and candor of witnesses.
(Citations omitted.)
[¶ 27] In 1969, the North Dakota Legislative Assembly enacted the Uniform Juvenile Court Act, N.D.C.C. ch. 27-20. Section 27-20-56(1), N.D.C.C., governs appeals *541 of juvenile court orders to this Court and provides, "The appeal must be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." We have consistently characterized this standard, as the majority does, at ¶ 5, as similar to a trial de novo.
[¶ 28] Until its repeal in 1971, N.D.C.C. § 28-27-32 provided the standard of review for questions of fact in appeals from all bench trial decisions. Section 28-27-32, N.D.C.C., provided, "The supreme court shall try anew the questions of fact." This standard of review was known as "trial de novo." See, e.g., Parker Hotel Co. v. City of Grand Forks, 177 N.W.2d 764, 772-73 (N.D.1970); see also Trengen v. Mongeon, 200 N.W.2d 50, 52 (N.D.1972) (characterizing the former standard of review, under N.D.C.C. § 28-27-32, "the socalled `trial de novo'").
[¶ 29] Effective August 1, 1971, Rule 52, N.D.R.Civ.P., was amended to state, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[2]
[¶ 30] On September 7, 1971, the Court decided In re J.Z., 190 N.W.2d 27 (N.D. 1971), a parental termination case. Relying on In re Walter, 172 N.W.2d 603 (N.D. 1969), the Court articulated the standard of review by simply stating, "An appeal taken under the Uniform Juvenile Court Act, N.D.C.C. 27-20, is triable anew in this Court." J.Z., 190 N.W.2d at 29. Offering a bit more guidance later in the opinion, the Court stated:
On appeal, although the findings of fact by the trial court are accorded appreciable weight, the Supreme Court is not bound thereby but has the duty to review all evidence, to find the facts anew independently of the trial court's findings, and to apply the law to the facts as found by the appellate court.
Id. at 34. To support this articulation of the standard of review, the Court cited Verry v. Murphy, 163 N.W.2d 721 (N.D. 1968); Kelmis v. Cardinal Petroleum Co., 156 N.W.2d 710 (N.D.1968); Wheat v. Patterson, 154 N.W.2d 367 (N.D.1967). Notably, these cases were all decided before the repeal of N.D.C.C. § 28-27-32 and the amendment to Rule 52. The Court failed to acknowledge this change.
[¶ 31] In 1972, in In re A.N., 201 N.W.2d 118, 120 (N.D.1972), the Court addressed the matter:
What is the scope of our review in juvenile cases? We are troubled with a seeming conflict between the Uniform Juvenile Court Act (Chapter 27-20, N.D.C.C.) and Rule 52(a) of the North Dakota Rules of Civil Procedure.
[¶ 32] After reciting Rule 52(a) and the pertinent part of N.D.C.C. § 27-20-56(1), the Court commented:
It is obvious that the adoption of Rule 52(a) in August 1971 as an amendment to the existent Rules was designed to set a new standard for reviewing questions of facta standard that gives the trial judge more finality of decision. The 1971 session of the Legislature (Senate Bill 2252) abolished the so-called `de novo' statute. Accordingly, Rule 52(a) was amended to conform to the Federal Rule 52(a) and includes the scope of review given to findings of fact by the trial court. The Federal Rule applies to any civil action tried without a jury save *542 for the exceptions and limitations stated in Federal Rule 81, Wright & Miller, Federal Practice and Procedure: Civil § 2572.
A.N., at 121 (footnote omitted). The Court quoted N.D.R.Civ.P. 81, which specifies:
(a) Special statutory proceedings. Special statutory proceedings, whether or not listed in Table A, are excepted from these rules in so far as they are inconsistent or in conflict with the procedure and practice provided by these rules.
Table A includes N.D.C.C. ch. 27-20.
[¶ 33] The Court, in A.N., relying on the provisions of Rule 81, concluded the Juvenile Court Act prevailed over Rule 52(a) insofar as the two were inconsistent and in conflict, and opined:
Section 27-20-56, N.D.C.C., of the Act, appears to be a return, in juvenile cases, to the old de novo statute, Section 28-27-12, N.D.C.C.[3] It provides for a type of trial anew, giving appreciable weight to the findings. As much as we would like to avoid a return to old ways and the attendant discomfiture for both appellants and trial courts, we cannot avoid the clear wording of Section 27-20-56, N.D.C.C. Such an interpretation affirms what we said in In re J.Z., supra, and the general history of Federal Rule 52(a), in that there are several special proceedings in which the Federal Rule is inapplicable.
A.N., at 121 (footnotes and citation omitted).
[¶ 34] The standard of review in juvenile cases has evolved since A.N. The standard, as articulated by the majority today, is said to be similar to trial de novo rather than actual trial de novo. Since A.N., the Court has embraced de novo review in juvenile cases with varying amounts of affinity and has employed different adjectives to describe the degree of similarity to trial de novo. See, e.g., Jacobson v. V.S., 271 N.W.2d 562, 566 (N.D.1978) (characterizing the scope of review as "comparable" to trial de novo); McGurren v. S.T., 241 N.W.2d 690, 694 (N.D.1976) (characterizing the scope of review as "equivalent" to trial de novo); In re M.L., 239 N.W.2d 289, 291 (N.D.1976) (characterizing the scope of review as "much like" trial de novo).
[¶ 35] I do not write to expound on the artificial differences among the Court's articulations of the standard of review. Rather, I write to express my opposition to the use of any de novo-like standard to review findings of fact in juvenile cases. I fail to see how the "clear wording" of N.D.C.C. § 27-20-56 is, in any respect, a "return to, in juvenile cases, the old de novo statute." A.N., 201 N.W.2d at 121. The former de novo statute clearly stated that questions of fact were tried anew. See N.D.C.C. § 28-27-32 (repealed 1971). Under N.D.C.C. § 27-20-56(1), the Court merely reviews the files, records, and minutes or transcript of the evidence of the juvenile court. In my opinion, the plain language of N.D.C.C. § 27-20-56(1) does not require a de novo review.
[¶ 36] Rule 81, N.D.R.Civ.P., does not remove juvenile proceedings from the application of the rules. Rather, it excepts juvenile proceedings from the rules "in so far as they are inconsistent or in conflict with the procedure and practice provided by these rules." In other words, Rule 81, N.D.R.Civ.P., does not provide a complete exception from the application of the rules of civil procedure. See Tormaschy v. Tormaschy, *543 1997 ND 2, ¶ 15, 559 N.W.2d 813 (stating, "Just as the Federal Courts have applied the Federal Rules to procedurally assist and fill in the gaps for excepted statutes, so too will we apply the North Dakota Rules of Civil Procedure to proceedings found in Rule 81." (Emphasis added.)) Moreover, N.D.C.C. § 27-20-57 of the Uniform Juvenile Court Act provides: "The supreme court of this state may adopt rules of procedure not in conflict with this chapter governing proceedings under it."
[¶ 37] I fail to see the supposed conflict, identified in A.N., between N.D.C.C. § 27-20-56(1) and Rule 52(a). I believe the rule and the statute can, and should, be read together to require a clearly erroneous standard of review based upon the files, records, and minutes or transcript of the evidence, giving appreciable weight to the findings of the juvenile court.
[¶ 38] It has been argued the issues at stake in juvenile proceedings are too important to be addressed on appeal using nothing more than a clearly erroneous standard of review. I find this argument unconvincing. We apply the clearly erroneous standard in child custody cases. See, e.g., Peek v. Berning, 2001 ND 34, ¶ 4, 622 N.W.2d 186 (applying the clearly erroneous standard); see also In re J.S.P.L., 532 N.W.2d 653, 662 (N.D.1995) (stating that a parent's right to the companionship, care, custody and management of his or her children is an important interest that warrants deference and protection.) We review a criminal conviction entered upon a jury verdict of guilty by looking only to the evidence most favorable to the verdict, giving the verdict the benefit of all inferences reasonably to be drawn in its favor, to see if there is substantial evidence to support it. State v. Fraser, 2000 ND 53, ¶ 3, 608 N.W.2d 244. Although the standard of review applied to criminal jury verdicts is not the clearly erroneous standard, it is at least as deferential. Because the stakes in custody and criminal cases are as grave as the stakes involved in juvenile cases, I see no sound reason for not applying the clearly erroneous standard in juvenile cases.
[¶ 39] I acknowledge the importance of the rule of stare decisis, grounded upon the theory that when a legal principle is accepted and rights may accrue under it, security and certainty require the principle be recognized and followed thereafter. Dickie v. Farmers Union Oil Co. of LaMoure, 2000 ND 111, ¶ 13, 611 N.W.2d 168. However, "`[t]he rule of stare decisis... is not sacrosanct.'" Abbey v. State, 202 N.W.2d 844, 852 (N.D.1972) (quoting Otter Tail Power Co. v. Von Bank, 72 N.D. 497, 8 N.W.2d 599 (1942)); see also Patterson v. McLean Credit Union, 491 U.S. 164, 172, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ("Our precedents are not sacrosanct."); Williams v. Florida, 399 U.S. 78, 128, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Harlan, J., concurring and dissenting) (Stare decisis "[w]oodenly applied ... builds a stockade of precedent that confines the law."); Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940) ("[S]tare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision.").
[¶ 40] I believe it is injudicious to doggedly adhere to a standard of review formulated without rigorous, thoughtful analysis. In my opinion, the Court failed to conduct such an analysis in A.N. The cases after A.N. failed to question the standard articulated in A.N., and the standard we have today, nearly thirty years later, is the product of mechanical adherence to the latest decision. In my opinion, A.N. and its progeny misinterpret the interplay between N.D.C.C. § 27-20-56(1) and Rule *544 52(a), and, to that extent, should be overruled.
[¶ 41] WILLIAM A. NEUMANN, J., concurs.
NOTES
[1] All names in parentheses following initials are pseudonyms.
[2] Rule 52(a), N.D.R.Civ.P., currently specifies, "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."
[3] Presumably, the citation to N.D.C.C. § 28-27-12, was a clerical error, and the Court meant to cite N.D.C.C. § 28-27-32.