653 N.W.2d 713 (2002)
2002 ND 188
In the Interest of D.Q., D.M., S.S., and C.W., Children.
Constance L. Cleveland, Petitioner and Appellee,
v.
Director, Cass County Social Services, S.S., L.Q., E.M., J.W., D.Q., C.W., Respondents,
D.M., S.S., and Benjamin Thomas, Guardian Ad Litem, Respondents and Appellees, and
S.S., Respondent and Appellant.
Nos. 20020078, 20020079.
Supreme Court of North Dakota.
December 4, 2002.
*715 Constance Louise Cleveland, Assistant State's Attorney, Fargo, N.D., for petitioner and appellee.
Benjamin Eugene Thomas (on brief), Guardian Ad Litem, Fargo, N.D., for respondents and appellees D.M. and S.S.
C. Charles Chinquist, Fargo, N.D., for respondent and appellant.
VANDE WALLE, Chief Justice.
[¶ 1] Susan Steel[1] appealed a judgment extending prior orders placing two of her children, D.M. and S.S., in the legal and physical custody of the Cass County Social Services Board ("Board") and terminating the parental rights of Steel and Ernest McNeel[2] to S.S. We affirm.
*716 [¶ 2] On April 29, 1999, the Richland County Juvenile Court issued an order finding four of Steel's six children, D.Q., D.M., S.S., and C.W., were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for their physical, mental, emotional health, or morals," as shown by absences from school, inadequate clothing and hygiene concerns, and transferring the matter to the Juvenile Court in Cass County, where, by that time, they were living, for disposition.
[¶ 3] A Cass County Juvenile Court referee notified the parties a permanency hearing would be held on December 18, 2000. Constance L. Cleveland sought an order terminating all parental rights to S.S. As to D.Q., D.M., and S.S., a judicial referee held a hearing on the matters on August 15-17, 2001. Steel's three other children were not involved in the proceedings, as one was an adult, and two were living with their father. The referee issued findings of fact, conclusions of law, and an order terminating the Board's custody of D.Q., D.M., and S.S., and returning their custody to Steel.
[¶ 4] Cleveland requested the district court judge to review the referee's findings and order. On February 1, 2002, the court issued a memorandum opinion and order. In its analysis, the court found, among other things:
The record developed from the proceedings in August 2001, provides clear and convincing evidence that D.M. and S.S. are deprived children and this deprivation is not primarily due to lack of financial resources. First, [Steel] has not provided adequate parental involvement with respect to education: [Steel] has failed to ensure regular school attendance by D.M. and has not responded in the past to correspondence or requests for information from school officials. [Steel's] explanation that D.M. was absent from school because of a bully, and because school officials never did anything about the teasing ... is not a typical, or adequate reason, for a child to be absent 100 days during the school year.... Furthermore, the fact that D.M. did not attend school from January 2000 to April 2000, when she was in Pennsylvania, further illustrates that [Steel] has no concern for whether D.M. obtains even the most basi[c] education....
Second, [Steel] has failed to ensure that S.S. receives proper medical treatment. Even though [S.S.] was diagnosed with epilepsy in August 2000, and takes medication for seizures, [Steel] still disagrees with that diagnosis and will seek a second opinion. [Steel] is opposed to chemicals, i.e., prescription medication, and states she will seek an herbal alternative "in the mean time."... [Steel] also does not provide regular dental appointments for the children ... and has not properly monitored whether the children need eyeglasses.
Third, [Steel's] past behavior is not consistent with a mother who is trying to obtain custody of her children. After the children were removed in January 2000, and at a time when she should have been conscious of how her behavior might reflect on her parenting skills, [Steel] (1) refused to comply with a court order that she produce D.Q. and D.M.... [Steel] also admitted she talked with D.Q. about D.Q. getting married so D.Q. could escape custody of social services.... Indeed, these incidents seem to indicate that [Steel] does not consider how her actions affect the needs of her children.
....
Another incident which cannot be taken lightly is the fact that [Steel] essentially *717 abandoned S.S., C.W., and R.W., after she went to Pennsylvania, and had no contact with them until she returned to North Dakota in August 2000....
In addition, according to her own testimony, [Steel] has a history of abusive relationships with alcoholic and chemically addictive male partners, some of whom are fathers of the children, and some who have simply lived in the family home, acting as caregivers for the children.
....
[Steel] now states that throughout these proceedings, she has not had a problem with social services, but refuses to deal with Leslie Johnson and Carrie Smith and is now willing to do whatever is necessary for D.M. "to be free." ... [Steel's] testimony during the August 2001 proceedings, however, shows that she still refuses to take responsibility for her choices and behavior that have caused the children to be deprived.... In addition, Dr. Witte-Bakken's report recommends that [Steel's] "style of thinking and relating is entrenched."... Dr. Witte-Bakken also stated in her report that she did "not see evidence that [Steel] has motivation to look at things differently or to reassess her parenting style, therefore it would appear that [Steel] would continue on the same course, should the children be returned." Id.

....
D.M. and S.S. have suffered from physical, mental and emotional harm as the result of past deprivation in connection with [Steel's] past history disobeying court orders, refusal to cooperate with social services who are trying to provide services to her children, apathetic attitude toward whether her children obtain a basic education, inattentiveness to the medical needs of her children, and disrespect for the property rights of others. For whatever reasons, [Steel] fails to recognize that D.M. and S.S. have suffered as a result of her lifestyle choices and has in no way indicated that she is motivated in changing her parenting style. As a result, if returned to [Steel's] custody, D.M. and S.S. will return to the same environment where they were deprived of the most basi[c] needs and that D.M. and S.S. in the future will probably suffer serious, physical, mental, or emotional harm.
[¶ 5] The court concluded:
D.M. and S.S. have been involved with social services since 1996, when they were removed from [Steel's] home. [Steel's] numerous relocations to different communities within the last several years illustrate the difficulty of providing services to a family. Each time [Steel] and the children have moved to a new community, and reports were filed with social services, the process of investigating whether the children were adequately cared for would begin anew. As a result, determining what services the children needed was a lengthy process. Based on [Steel's] refusal to comply with court orders and social services, apathetic attitude toward whether her children obtain a basic education, inattentiveness to medical needs of her children ... there is clear and convincing evidence to find that D.M. and S.S. have suffered from physical, mental and emotional harm as the result of past deprivation, that the deprivation will continue in the future, and that it is probable that they will suffer physical, mental, or emotional harm [ ] if they are returned to their mother. As a result, [Steel's] parental rights as to S.S. should be terminated and D.M. shall remain in custody of Cass County Social Services. The juvenile *718 court's decision to the contrary is reversed.
[¶ 6] The court ordered that: (1) the judicial referee's findings, conclusions, and order be reversed; (2) the petition to terminate parental rights to S.S. be granted; and (3) D.M. remain in the custody of the Board.[3] Judgment was entered on February 28, 2002.

I
[¶ 7] Steel contends the court erred by engaging in a de novo review of the referee's decision, instead of employing a "clearly erroneous" standard of review. She also contends that in employing a de novo review of the court's decision, this Court must give appreciable weight to the referee's findings, because the referee had the opportunity to observe the candor and demeanor of the witnesses.
[¶ 8] "[A] district court's review of a judicial referee's findings and recommendations under Administrative Rule 13, § 11(b), when it is a review of the record, is governed by Rule 53, N.D.R.Civ.P." Benson v. Benson, 495 N.W.2d 72, 77 (N.D.1993). "Under Rule 53(f)(2), N.D.R.Civ.P., the district court was obliged to accept the referee's findings unless they were clearly erroneous.... The correctness of a referee's findings is an issue that must be determined by the district court in the first instance." Benson, at 78. When the district court rejects a judicial referee's factual findings, this Court employs a two-step review of the district court's factual determinations:
First, we must review, as a matter of law, the correctness of the district court's reversal, under the clearly erroneous standard, of any factual findings by the judicial referee. Second, if the district court's reversal of findings is upheld, we must then review the substitute or additional findings of the district court under the clearly erroneous standard of Rule 52(a), N.D.R.Civ.P.
Benson, at 77. See also Darling v. Gosselin, 1999 ND 8, ¶ 6, 589 N.W.2d 192; Throndset v. Hawkenson, 532 N.W.2d 394, 397 (N.D.1995). A judicial referee's conclusions of law are fully reviewable in the district court, and the district court's conclusions of law are fully reviewable upon appeal to this Court. Darling, at ¶ 6.
[¶ 9] In proceedings under the Uniform Juvenile Court Act, this Court's review of a juvenile court decision is governed by N.D.C.C. § 27-20-56, which provides, in part, that an appeal from a juvenile court's final order, judgment, or decree "must be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." "This court's review of a juvenile court's order is similar to a trial de novo." In re A.E., 1997 ND 9, ¶ 3, 559 N.W.2d 215. "We independently review the evidence, and our review is not limited to a determination of whether the juvenile court's findings are clearly erroneous." Id. "We afford the juvenile court's findings appreciable weight, but we are not bound by them." In re A.V., 554 N.W.2d 461, 463 (N.D.1996).
[¶ 10] Although the juvenile court did not specifically state the referee's findings were clearly erroneous, the court did reverse them, and did make substitute findings. We conclude the juvenile court found the referee's findings were clearly erroneous. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if the reviewing court, on the *719 entire evidence is left with a definite and firm conviction a mistake has been made. DesLauriers v. DesLauriers, 2002 ND 66, ¶ 6, 642 N.W.2d 892. From our independent review of the record, we conclude there is evidence which leaves us and obviously left the juvenile court judge with a definite and firm conviction a mistake had been made by the referee.

II
[¶ 11] Steel contends current or continuing deprivation of the children was not shown by clear and convincing evidence.
[¶ 12] Section 27-20-30(1), N.D.C.C., provides that if a "child is found to be a deprived child, the court may ... [p]ermit the child to remain with the child's parents, guardian, or other custodian,... transfer temporary legal custody to" another individual or agency, "[r]equire the parents, guardian, or other custodian to participate in treatment," or place the child in "some other planned permanent living arrangement." Section 27-20-02(8), N.D.C.C., defines a deprived child, in part, as one who has been abandoned or who:
Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian.
"As used in N.D.C.C. § 27-20-02(8)(a), the phrase `proper parental care' means the `minimum standards of care which the community will tolerate.' See In Interest of K.R.A.G., 420 N.W.2d 325, 327 (N.D.1988)." In re J.R., 2002 ND 78, ¶ 9, 643 N.W.2d 699. But, lack of cleanliness of the home does not alone establish deprivation. In re J.K.S., 274 N.W.2d 244, 249 (N.D.1979).
[¶ 13] Prior to its repeal in 2001, N.D.C.C. § 15-34.1-01 required, with exceptions not relevant here, anyone with control over an educable child between seven and sixteen years of age to take or send the child to a public school the entire time school was in session.[4] Section 15.1-06-04, N.D.C.C., provides, in part: "During each school year, a school district shall provide for a school calendar of at least one hundred eighty days." Under N.D.C.C. § 27-20-02(1), a parent of a child not in the parent's custody abandons the child by failing "without justifiable cause: (1) To communicate with the child; or (2) To provide for the care and support of the child as required by law." A finding of deprivation under N.D.C.C. § 27-20-02(8) must be supported by clear and convincing evidence. In re J.R., 2002 ND 78, ¶ 9, 643 N.W.2d 699.
[¶ 14] As the juvenile court observed, "D.M. and S.S. have been involved with social services since 1996, when they were removed from [Steel's] home. [Steel's] numerous relocations to different communities within the last several years illustrate the difficulty of providing services to a family." "A parent's frequent moving is evidence of the parent's inability to provide a stable environment for a child." In re D.F.G., 1999 ND 216, ¶ 16, 602 N.W.2d 697.
[¶ 15] In January 2000, Steel took D.Q. out of Home on the Range without permission. From January 2000 to April 2000, when they were retrieved by the Board, D.M. and D.Q. were living with Steel in Pennsylvania and were not in school. D.M.'s junior high school reported she had a long history of absenteeism. Steel testified she knew D.M. "had been absent in *720 excess of 100 days in one school year" and was at home when she was absent from school. A teacher testified that, in the fourth grade, S.S. "never completed homework. And I would send correspondence every time she didn't complete it. I would send home a sheet for her mother to sign, and that rarely happened."
[¶ 16] S.S.'s case manager testified that when S.S. and two of Steel's other children came into custody of Cass County Social Services in January 2002, S.S. needed glasses, and another had at least eight abscessed baby teeth, which had to be extracted, and, "because there was so many extractions, that they put some type of spacer in afterwards to keep the teeth from coming together." Steel testified she would follow the doctor's advice that S.S. stay on her epilepsy medication "[u]ntil I get a second opinion" and "I'm vehemently against chemicals of any kind. And if he's mistaken, I would really hate to see her essence tainted, tainted with all them chemicals." Steel had no physical contact with the three youngest children, including S.S., for a period of 8 months while she was in Pennsylvania and the children were in custodial care in North Dakota.
[¶ 17] Upon reviewing the record as a whole, and giving appreciable weight to the juvenile court's findings, we conclude there is clear and convincing evidence D.M. and S.S. are deprived children and there was no evidence their deprivation is due primarily to their mother's lack of financial means.

III
[¶ 18] Section 27-20-44(1), N.D.C.C., provides the court may terminate the parental rights of the parents of a deprived child:
The court by order may terminate the parental rights of a parent with respect to the parent's child if:
a. The parent has abandoned the child;
b. The child is a deprived child and the court finds:
(1) The conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.
[¶ 19] Under N.D.C.C. § 27-20-44(1)(b)(1) the juvenile court may terminate parental rights if a child is deprived, the conditions and causes of the deprivation are likely to continue, and the child is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm. See, e.g., In re A.S., 1998 ND 181, ¶ 15, 584 N.W.2d 853. A party seeking parental termination must prove all elements by clear and convincing evidence. In re L.F., 1998 ND 129, ¶ 10, 580 N.W.2d 573. On appeal, we review the juvenile court's decision regarding termination of parental rights and examine the evidence in a manner similar to a trial de novo. A.S., at ¶ 13. "We review the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. N.D.C.C. § 27-20-56(1)." In re C.R., 1999 ND 221, ¶ 4, 602 N.W.2d 520.
[¶ 20] The juvenile court found Steel "essentially abandoned S.S." when she went to Pennsylvania in January 2000 and "had no contact with [her] until she returned to North Dakota in August 2000." "Of great importance when considering a possible abandonment is the contact and communication with the child." Pritchett v. Executive Dir., Soc. Serv. Bd. of North Dakota, 325 N.W.2d 217, 221 (N.D.1982). "A parent's negligent failure to perform his parental duties is significant *721 to the issue of abandonment." Id. The court also found "D.M. and S.S. have suffered from physical, mental and emotional harm as the result of past deprivation, that the deprivation will continue in the future, and that it is probable that they will suffer physical, mental, or emotional harm [ ] if they are returned to their mother." S.S.'s case manager testified S.S. has been seeing a psychologist since a month or two after she was placed in foster care in January 2000.
[¶ 21] "`Although it is impossible to be certain what might occur in the future, any prediction of the future requires some reflection into the past conduct of the parties.'" Hentz v. Hentz, 2001 ND 69, ¶ 12, 624 N.W.2d 694, quoting Reede v. Steen, 461 N.W.2d 438, 442 (N.D.1990). Prognostic evidence, including reports and opinions of the professionals involved, that forms the basis for a reasonable prediction as to future behavior must be evaluated in determining if a child's deprivation is likely to continue. In re D.F.G., 1999 ND 216, ¶ 20, 602 N.W.2d 697. "We are sensitive to the argument that it is dangerous to allow the judgment of social workers to determine how a family is run." Bjerke v. D.T., 248 N.W.2d 808, 814 (N.D.1976). But, "we consider the lack of parental cooperation with social service agencies, which is insufficient to establish deprivation but is pertinent to whether deprivation will continue." In re N.H., 2001 ND 143, ¶ 7, 632 N.W.2d 451. "[T]he primary purpose of N.D.C.C. ch. 27-20 is to protect the welfare of children." In re A.M., 1999 ND 195, ¶ 6, 601 N.W.2d 253. "To terminate parental rights, a court need not await the happening of a tragic event." In re T.K., 2001 ND 127, ¶ 17, 630 N.W.2d 38.
[¶ 22] Steel refused to produce D.M. when directed to do so by the juvenile court, when she "knew where [D.M.] was ... sort of." Steel explained: "Say I didn't want to lie in Court, so I told my friends to take her somewhere.handy and be available by cell phone, so that when I didn't know where they were I was telling the truth." A clinical psychologist who performed a parental capacity evaluation reported, in part:
Ms. [Steel's] style of thinking and relating is entrenched, and is not likely to change. I do not see evidence that she has motivation to look at things differently or to reassess her parenting style, therefore it would appear that she would continue on the same course, should the children be returned.
The children have suffered physical, mental and emotional harm. Steel has failed to cooperate with the juvenile court and social service agencies, she has been inattentive to the children's medical needs, she has failed to ensure the children's school attendance, she has a history of abusive relationships with alcoholic male partners living in the household, and she appears likely to continue as she has been.
[¶ 23] When appreciable weight is given to the juvenile court's findings and the record is reviewed as a whole, we conclude the evidence clearly and convincingly shows S.S. is deprived, there is no evidence the deprivation is due primarily to Steel's lack of financial means, the conditions and causes of the deprivation are likely to continue, and S.S. is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm, justifying the juvenile court's decision to terminate Steel's parental rights in S.S.
[¶ 24] The judgment is affirmed.
[¶ 25] CAROL RONNING KAPSNER, DALE V. SANDSTROM, and MARY MUEHLEN MARING, JJ., concur.
*722 NEUMANN, Justice, concurring specially.
[¶ 26] I agree with much of the majority opinion and with its result. I write separately to discuss standards of review.
[¶ 27] It strikes me as totally incongruous that a juvenile court judge is to apply only a clearly erroneous standard when reviewing a referee's findings, but this Court will conduct a review "similar to a trial de novo." In Interest of A.E., 1997 ND 9, ¶ 3, 559 N.W.2d 215. I recognize Benson v. Benson, 495 N.W.2d 72 (N.D.1993), says the district court is to apply the clearly erroneous standard in reviewing a referee's findings, and that Benson is precedent. But Benson, which was not a juvenile case, also says this Court will apply a clearly erroneous standard in reviewing what the district court did. Benson makes sense, but what we are doing here does not.
[¶ 28] I have already written separately about our de novo review in juvenile cases. Interest of C.R.C., 2001 ND 83, 625 N.W.2d 533, (Neumann, J., concurring). It seems clear de novo review in juvenile cases is nothing more than a vestigial echo of an earlier time when all questions of fact in bench trials were subject to de novo appellate review. For virtually all other purposes, de novo review of fact questions was abolished in 1971, with an amendment to N.D.R.Civ.P. Rule 52. Interest of C.R.C., at ¶ 29. There is no reason to retain this anachronistic anomaly for juvenile cases. Its inappropriateness to the modern theories of appellate review is highlighted by the inconsistent standards applied in this case. This Court should no longer apply a de novo standard of review to questions of fact in juvenile cases.
[¶ 29] WILLIAM A. NEUMANN.
NOTES
[1] "Susan Steel" is a pseudonym.
[2] "Ernest McNeel" is a pseudonym. He is S.S.'s father.
[3] D.Q. had become an adult and was no longer involved in the case.
[4] Compulsory attendance is now codified at N.D.C.C. § 15.1-20-01.