2003 ND 68

In the Interest of B.N. and K.K., Children.

Tammy Balliet, Petitioner and Appellee,

v.

S.N., Mother; B.F. or John Doe, Putative Fathers of B.; K.K., Father of K.; B.N. and K.K., Children; and their Guardian ad Litem, Anne E. Summers, Attorney at Law, Respondents,

K.K., Father of K., Respondent and Appellant.

In the Interest of B.N. and K.K., Children.

Tammy Balliet, Petitioner and Appellee,

v.

S.N., Mother, Respondent and Appellant,

B.F. or John Doe, Putative Fathers of B.; K.K., Father of K.; B.N. and K.K., Children; and their Guardian ad Litem, Anne E. Summers, Attorney at Law, Respondents.

Nos. 20020256, 20020281.

Supreme Court of North Dakota.

May 6, 2003.

Susan Schmidt, Severin, Ringsak & Morrow, Bismarck, for respondent and appellant, K.K., Father of K.

Charles R. Isakson, Chapman and Chapman, Bismarck, for respondent and appellant, S.N., Mother.

Brandi Sasse Russell, Assistant State's Attorney, Bismarck, for petitioner and appellee.

MARING, Justice.

[¶ 1] S.N. ("Sarah," a pseudonym) appeals from the August 28, 2002, Memorandum Opinion and the September 13, 2002,

Findings of Fact and Order terminating her parental rights to her daughters, B.N. ("Becky," a pseudonym) and K.K. ("Kelly," a pseudonym). In a consolidated appeal, K.K. ("Kevin," a pseudonym) appeals from the same Memorandum Opinion and Findings of Fact and Order which also terminated his parental rights to his daughter, Kelly. We hold there is clear and convincing evidence the children are deprived, the causes and conditions of the deprivation are likely to continue, and as a result of the continued deprivation, the children will probably suffer serious physical, mental, or emotional harm if Sarah's and Kevin's parental rights are not terminated. We affirm.

[¶ 2] Sarah is the mother of Becky, age 9, and Kelly, age 4. The father of Becky is not a party to this appeal. He was found to be in default when he did not appear at the hearing to terminate his parental rights. Kevin is the father of Kelly.

[¶ 3] Sarah has been the subject of seven investigations conducted by Burleigh County Social Services ("Social Services"). Six of these investigations were conducted before Kelly's birth and only dealt with Sarah's care of Becky. Kevin was not the subject of those six investigations. There was one investigation that occurred after Kelly's birth. It dealt with the care of both Becky and Kelly.

[¶ 4] The first investigation began on March 11, 1994, after Social Services received a report that Sarah was neglecting Becky's needs and that there was yelling and drinking going on in the home. After investigating, the Child Protection Team found indications of physical neglect and emotional abuse. It was recommended Sarah have drug and alcohol evaluations and that she complete domestic violence treatment. Sarah did not follow through on those recommendations.

[¶ 5] The second investigation began on November 22, 1994, after Social Services received a report that Becky was not regularly bathed or fed and that Sarah would leave Becky at the babysitter's for extended periods of time without telling anyone where she could be contacted. After the Child Protection Team investigated, it recommended Sarah complete domestic violence treatment and counseling. Sarah was also referred by Social Services to the Self–Reliance Program due to her financial problems. Sarah did not follow through on those recommendations.

[¶ 6] The third investigation began on September 9, 1996, after Social Services received a report that Sarah was leaving Becky unattended and inadequately supervised. After the investigation, the Child Protection Team expressed concerns about Sarah's emotional and medical needs and recommended counseling and domestic violence treatment. Sarah did not follow those recommendations.

[¶ 7] After a fourth investigation on February 25, 1997, the Child Protection Team did not recommend any services.

[¶ 8] The fifth investigation began on July 11, 1997, after Social Services received a report that Becky possibly was being sexually abused. After the investigation, the Child Protection Team found services were required for Sarah to have a psychological evaluation and to take Becky for a sexual abuse examination. When Sarah failed to follow the recommendation, Social Services petitioned for custody of Becky in January of 1998. After the petition was filed, Sarah submitted to a psychological evaluation and took Becky for a sexual abuse examination. As a result of Sarah's compliance with the recommendations, the petition for custody was dropped. The sexual abuse examination of Becky confirmed the suspicions Becky had

been sexually abused. However, the identity of the abuser was never determined.

[¶ 9] A sixth investigation began on April 16, 1998. It was also on this date Sarah took Becky to live with Sarah's father and step-mother, C.W. ("Carl," a pseudonym) and L.W. ("Laura," a pseudonym). Sarah took Becky to her maternal grandparents after she was a bystander victim in a domestic assault which occurred at the babysitter's. Soon after Sarah brought Becky to live with Carl and Laura, she wrote a note indicating the arrangement would continue only until the end of the summer. However, Sarah never returned for Becky. Becky has lived with her grandparents continuously for almost five years.

[¶ 10] Kelly was born on September 19, 1998. At that time, Sarah and Kevin were living together. Subsequently, however, Kevin was incarcerated from February 9, 1999, until March 17, 1999, on two counts of non-sufficient funds and from November 15, 1999, until December 3, 1999, for probation revocation and non-sufficient funds.

[¶ 11] The seventh investigation began on December 3, 1999, after Social Services received a report that Kelly was being neglected. Specifically, the reporter had concerns that there was no food in the home and that the home was unsanitary. It was recommended Sarah and Kevin have psychological examinations. Both Sarah and Kevin did follow through with this recommendation.

[¶ 12] About December 9, 1999, Kevin was arrested at the family home on drug-related charges while Kelly was present. Kevin was subsequently incarcerated for Possession of Methamphetamine, Possession of Drug Paraphernalia, and Theft of Property until January of 2001.

[¶ 13] On February 7, 2000, after a physical altercation between Sarah and a neighbor, Sarah signed a 30–day parental affidavit, allowing placement of Kelly with Carl and Laura. Kelly has lived with her grandparents continuously since that time.

[¶ 14] In July of 2001, Social Services filed a petition for custody of Becky and Kelly. A hearing was held on August 28, 2001. The judicial referee entered his findings and order on September 24, 2001. Sarah and Kevin stipulated to the details of the custody order which found the two children deprived and placed them in the custody of Social Services for nine months. Becky and Kelly were placed with their grandparents, Carl and Laura, who had become licensed foster parents.

[¶ 15] In December of 2001, Kevin was incarcerated for Possession of Cocaine and Possession of Drug Paraphernalia. He was due to be released in February or March of 2003.

[¶ 16] On April 26, 2002, Social Services filed a petition to terminate all parental rights to Becky and Kelly. The hearing was held on July 19, 2002. The juvenile court filed its Memorandum Opinion on August 28, 2002, which found Becky and Kelly were deprived, the deprivation was likely to continue, and that they will probably suffer serious harm as a result. The juvenile court ordered the termination of Sarah's and Kevin's parental rights. The Findings of Fact and Order was filed on September 16, 2002. Kevin filed his Notice of Appeal on September 19, 2002, and Sarah filed her Notice of Appeal on October 9, 2002.

[¶ 17] On appeal, Kevin argues Social Services has not proven by clear and convincing evidence that Kelly is deprived, that the deprivation is likely to continue, or that Kelly will suffer harm as a result. Sarah concedes Becky and Kelly are deprived, but joins Kevin in the other two arguments as to both children. We disagree with both Appellants' arguments.

[¶ 18] We review a juvenile court's decision to terminate parental rights in a manner similar to a trial de novo, giving appreciable weight to the juvenile court's findings because that court had the opportunity to observe the candor and demeanor of the witnesses. *See In re D.N.*, 2001 ND 71, ¶ 2, 624 N.W.2d 686. *But see In re D.Q.*, 2002 ND 188, ¶¶ 26–28, 653 N.W.2d 713 (Neumann, J., concurring specially); *In re C.R.C.*, 2001 ND 83, ¶¶ 25–40, 625 N.W.2d 533 (Neumann, J., concurring) (suggesting the clearly erroneous standard of review, rather than the de novo standard, should be applied in juvenile cases). Under N.D.C.C. § 27–20–44(1)(b)(1) (2002), termination of parental rights requires satisfaction of a three-pronged test in which the party petitioning for termination must prove by clear and convincing evidence: (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue; and (3) by reason thereof, the child is suffering, or will probably suffer, serious physical, mental, moral, or emotional harm. *See D.N.*, at ¶ 2.

## I

[¶ 19] A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27–20–02(8)(a) (2002). Parents' fundamental and natural rights to their children are of constitutional dimension, but are not absolute, and parents are required to provide care to their children that at least satisfies the minimum community standards. *See In re T.K.*, 2001 ND 127, ¶ 12, 630 N.W.2d 38.

[¶ 20] The record supports, with clear and convincing evidence, Becky and Kelly are deprived children. In the record of the hearing, there is evidence of physical neglect, inadequate supervision, neglect of medical needs, emotional abuse, and sexual abuse over the course of the seven investigations done by Social Services. Also at the hearing, there was evidence of domestic violence between Sarah and Kevin and a history of drug and alcohol abuse. Laura, the children's step-grandmother, testified that before the children came to live with them, Becky was not getting to school regularly and was not being properly supervised. She also testified that when Becky and Kelly were living with Sarah, the children were not being properly fed and were not being taken for their scheduled doctor appointments. Dr. Paul Jondahl, the children's primary physician, testified that after Kelly was born, she was not brought in for her scheduled immunizations. He testified that although Kelly was now up-to-date with her shots, oftentimes, it was Laura who made sure she was brought in for the appointments.

[¶ 21] When her children were living with her, Sarah did not provide a safe, healthy, loving environment for the children. Kevin has provided little care or support for his child, Kelly, mostly as a result of his past and present incarcerations. *See In re C.R.*, 1999 ND 221, ¶ 6, 602 N.W.2d 520 (concluding the child was deprived of parental care and support because of her father's voluntary criminal activity which put him in prison). We conclude Becky and Kelly are deprived children.

## II

[¶ 22] Although evidence of previous deprivation can be considered in determining whether deprivation is likely to continue, it cannot alone be enough to

terminate parental rights. *See In re D.R.*, 2001 ND 183, ¶ 11, 636 N.W.2d 412. There must be additional prognostic evidence to reasonably predict the deprivation will continue or be unremedied. *See id.* Our Court has defined prognostic evidence as "evidence that forms the basis for a reasonable prediction as to future behavior." *In re A.S.*, 1998 ND 181, ¶ 19, 584 N.W.2d 853 (quoting *McBeth v. M.D.K.*, 447 N.W.2d 318, 321 (N.D.1989)).

[¶ 23] There is clear and convincing evidence that Becky and Kelly's deprivation would likely continue if Sarah resumed parenting responsibilities. We have stated: "In determining the likelihood of continuing deprivation, a court may consider parental cooperation with social-service agencies." *In re S.F.*, 2000 ND 161, ¶ 10, 615 N.W.2d 511. Although lack of parental cooperation is insufficient by itself to prove deprivation, it is relevant to the issue of whether deprivation will continue. *See id.*

[¶ 24] The record in this case is replete with recommendations by Social Services to Sarah to participate in services in order to help improve her parenting ability. The list includes: drug and alcohol evaluations, psychological evaluations, domestic violence treatment, parenting classes, nurturing classes, vocational rehabilitation, Parent Aide services, and relationship counseling. The only one of these recommendations Sarah followed through with was the psychological evaluations. Dr. Lisa Hay conducted the psychological evaluations and recommended Sarah take nurturing classes, obtain domestic violence treatment, and obtain anger management treatment. Sarah did not follow up on Dr. Hay's recommendations. Social Services also referred Sarah to programs like the Self–Reliance Program and the Adult Learning Center. Likewise, Sarah did not follow through with these recommendations. Sarah's failure to take any steps toward becoming a better parent or toward providing a healthy, secure environment for her children "demonstrates a serious indifference toward [her] responsibilities and obligations as a parent." *S.F.*, 2000 ND 161, ¶ 11, 615 N.W.2d 511 (quoting *C.R.*, 1999 ND 221, ¶ 10, 602 N.W.2d 520).

[¶ 25] There is nothing in the record to suggest Sarah now has the willingness or ability to improve her parenting abilities. Without Sarah acquiring the proper parenting skills, Becky and Kelly will continue to be deprived. "When there has been an extensive period in which efforts have been made to overcome a parent's inabilities to effectively parent, the courts cannot allow the children 'to remain in this indeterminate status midway between foster care and the obvious need for permanent placement.' " *D.N.*, 2001 ND 71, ¶ 14, 624 N.W.2d 686 (quoting *In re A.M.*, 1999 ND 195, ¶ 9, 601 N.W.2d 253).

[¶ 26] Likewise, there is clear and convincing evidence Kelly will continue to be deprived if Kevin's parental rights are not terminated. Kevin has a lengthy criminal history that has led him to be incarcerated for seven out of the last ten years. Kevin has been incarcerated for more than one-half of Kelly's life. He also admittedly struggles with a methamphetamine and cocaine addiction which is often the cause of his criminal activity.

[¶ 27] Imprisonment alone does not justify parental termination. *See In re J.L.D.*, 539 N.W.2d 73, 79 (N.D.1995). In addition to Kevin's recent imprisonment, however, his criminal history and his drug and alcohol addiction make it likely he will be incarcerated again in the future. *See id.* We have recognized: "[A] juvenile court need not operate in a vacuum in

termination proceedings. It can give substantial credence to evidence indicating a pattern of conduct by a parent that forms a basis for reasonable prediction of the parent's future behavior." *D.R.*, 2001 ND 183, ¶ 15, 636 N.W.2d 412 (citations omitted).

[¶ 28] After Kevin became aware that Social Services might pursue termination of his parental rights, he made a voluntary choice to re-offend. This demonstrates "a serious indifference toward his responsibilities and obligations as a parent." *C.R.*, 1999 ND 221, ¶ 10, 602 N.W.2d 520. "A casual display of interest by a parent does not overcome the significant effect of negligently failing to perform parental duties." *Id.*

[¶ 29] Kevin testified that since being incarcerated this last time, he has had drug and alcohol evaluations and has attended narcotics anonymous, a self-help group, sweat lodge, and prayer circle. He testified that after he is released, he plans to continue with an aftercare program or some kind of 12–step program with narcotics anonymous. While it is encouraging Kevin has been making strides to overcome his drug and alcohol dependency, he has had unsuccessful treatment attempts in the past. We have observed:

> However commendable it may be that a parent desires to change [his] lifestyle and to learn how to become a fit parent, the courts cannot allow the children to suffer the predictable consequences when it turns out the parent is unable to sufficiently turn around a dysfunctional lifestyle to become an effective parent.

*D.R.*, 2001 ND 183, ¶ 16, 636 N.W.2d 412. We conclude there is clear and convincing evidence Becky and Kelly will continue to be deprived.

## III

[¶ 30] When predicting future harm, "the probability of serious mental and emotional harm to a child may be established by prognostic evidence a parent's current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated." *C.R.*, 1999 ND 221, ¶ 10, 602 N.W.2d 520.

[¶ 31] In this case, neither Sarah nor Kevin are currently able to properly care for Becky and Kelly. In addition, the prognostic evidence suggests it will take a long period of time, if ever, before either parent would be able to properly care for the children. Dr. Lisa Hay testified Sarah has "borderline intellectual functioning," difficulty with verbal skills, and a deficit in her immediate auditory memory, all of which make it harder for her to learn. Dr. Hay stated in order for Sarah to better her parenting skills, she would need a lot of individualized, long-term care. Kevin admits that after his release, he will not immediately be able to take custody of his daughter. He will need to get his life in order and his drug addiction under control before he will be able to focus on Kelly's needs.

[¶ 32] Becky has been living with her grandparents for more than five years, which is over one-half of her life. Kelly has been living with her grandparents for more than two years, which is also over one-half of her life. Since Becky and Kelly have been living with Carl and Laura, Sarah has had only limited and sporadic contacts with her daughters and has provided them little care or support. Kevin, having been in prison for over one-half of Kelly's life, has also been unable to provide the necessary care or support for his daughter. "Long-term and intensive treatment for a parent is not mandated if

it cannot be successfully undertaken soon enough to enable the children to be returned to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care." *D.N.*, 2001 ND 71, ¶ 12, 624 N.W.2d 686. Becky and Kelly need a secure and permanent home with parents who can provide them with loving parental care. *See In re T.J.O.*, 462 N.W.2d 631, 635 (N.D.1990).

[¶ 33] Because Sarah's and Kevin's inability to properly care for the children will likely continue long enough to render improbable the successful assimilation of Becky and Kelly into a family, we conclude the evidence clearly and convincingly establishes Becky and Kelly will probably suffer serious mental or emotional harm if Sarah's and Kevin's parental rights are not terminated. *See T.J.O.*, 462 N.W.2d at 634–35; *In the Matter of P.R.D.*, 495 N.W.2d 299, 303 (N.D.1993).

[¶ 34] Therefore, we affirm the juvenile court's Memorandum Opinion and Findings of Fact and Order terminating Sarah's and Kevin's parental rights.

[¶ 35] GERALD W. VANDE WALLE, C.J., WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.