Filed 12/1/99 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

1999 ND 221

In the Interest of C.R., a Minor Child

Barb Reed, LSW, Petitioner and Appellee

v.

C.R., and her Guardian Ad Litem, 

Sharon Hauschulz, and her parents, S.L.,             Respondents

         and 

C.H.R., Respondent and Appellant

No. 990175

Appeal from the Juvenile Court of Towner County, Northeast Judicial District, the Honorable Lee A. Christofferson, Judge.

AFFIRMED.

Opinion of the Court by Neumann, Justice.

Lisa Beckstrom Gibbens, State’s Attorney, P.O. Box 708, Cando, N.D. 58324, for petitioner and appellee.

A. Swain Benson, Benson Law Office, 616 Main Street, Bottineau, N.D. 58318, for respondent and appellant.

In the Interest of C.R.

No. 990175

Neumann, Justice.

[¶1] C.H.R. (“Cliff,” a pseudonym) appealed from an order of the juvenile court terminating his parental rights to his daughter, C.R. (“Cathy,” a pseudonym).  We conclude there is clear and convincing evidence Cathy is a deprived child, the causes and conditions of the deprivation are likely to continue and, as a result of the continued deprivation, Cathy will probably suffer serious mental or emotional harm if Cliff’s parental rights are not terminated.  We affirm.

I

[¶2] Cathy was born on January 18, 1997 in Minot, where her mother, S.L. (“Susan,” a pseudonym), and Cliff were living together, but not married.  When Cathy was about three months old, Cliff and Susan voluntarily placed her into foster care because of the high level of stress in the household, Susan’s mental instability, and the discord between Cliff and Susan.  A few days after Cathy was placed in foster care, Cliff was arrested for holding Susan at knife point and threatening to kill her.  He pled guilty to class C felony terrorizing and was sentenced to one year and one day in the state penitentiary.  At that time, Cliff was on parole in Kentucky for several theft-related felony convictions.  He was sent to a Kentucky prison to serve his sentences for those crimes and the North Dakota conviction.  He has since been incarcerated there, with a scheduled release date of October 2000.  With good time, an early release of March 31, 2000 is possible, but not guaranteed.  Cliff has seen Cathy only one time since her placement in foster care and has had one very short phone call with her.  He has paid no financial support.  Cliff sent picture frames and a purse to Cathy, and he requested some friends to send her used clothing on one occasion.

[¶3] During Cathy’s stay in foster care, social workers assisted Susan to acquire the necessary parenting skills to return Cathy to her custody and care.  When it became clear that goal could not be met, the Towner County Social Service Agency filed a petition, on March 4, 1999, to terminate Cliff and Susan’s parental rights.  A hearing was held, at which Cliff was represented by an attorney and also participated by telephone from the Kentucky prison.  Susan voluntarily agreed to terminate her parental rights so Cathy could be placed for adoption, contingent upon the court also terminating Cliff’s parental rights.  The juvenile court found Cathy is a deprived child and the deprivation is likely to continue for a sufficient period that Cathy would likely suffer serious mental or emotional harm if Cliff and Susan’s parental rights were not terminated.  The court entered an order terminating Cliff and Susan’s parental rights and placing Cathy in the custody of the State Department of Human Services for the purpose of finding her a permanent adoptive home.  Cliff appealed.  

II

[¶4] Under N.D.C.C. § 27-20-44(1)(b)(1) the juvenile court may terminate parental rights, providing: 1) the child is a deprived child; 2) the conditions and causes of the deprivation are likely to continue; and 3) the child is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm.  
See
, 
e.g.
, 
In Interest of A.S.
, 1998 ND 181, ¶ 15, 584 N.W.2d 853.  The party seeking parental termination must prove all elements by clear and convincing evidence.  
In Interest of L.F.
, 1998 ND 129, ¶ 10, 580 N.W.2d 573.  On appeal, we review the juvenile court’s decision regarding termination of parental rights and examine the evidence in a manner similar to a trial de novo.  
In Interest of A.S.
, 1998 ND 181, ¶ 13, 584 N.W.2d 853.  We review the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court.  N.D.C.C. § 27-20-56(1).  

[¶5] On appeal, Cliff argues the juvenile court did not give adequate consideration to evidence suggesting Cathy is developing as a normal two year old in foster care and, if left in foster care for another year or more until Cliff is released from prison, she will continue to develop normally and will not suffer serious harm.  Cliff contends there is not clear and convincing evidence the causes and conditions of Cathy’s deprivation will continue for a sufficient time to result in serious harm to Cathy if Cliff and Susan’s parental rights are not now terminated.  We disagree.

[¶6] The definition of a deprived child is broad enough to encompass a child whose parent, while never having had the opportunity to care for the child, is shown to be presently incapable of providing proper parental care for the child.  
In Interest of J.L.D.
, 539 N.W.2d 73, 76 (N.D. 1995).  It is evident Cathy is presently deprived of Cliff’s parental care and support, and she will not have it for a considerable time, because Cliff’s voluntary criminal activity put him in prison.  The juvenile court specifically found:

. . . The evidence indicates that [Cliff] has a history of serious criminal activity.  He has displayed serious domestic violence against the mother of his child which would presumptively suggest he is a poor candidate for physical custody of his daughter. . . .  The history of irresponsible and violent behavior of [Cliff] continues to make him unable to provide the necessary care for [Cathy].  He continues to be unavailable for many months to provide any emotional support for his daughter.  

. . . [Cathy] is at a critical stage in her life.  She has developed emotional attachments with her foster parents.  Continuing foster care in the same home or in another for more than another year would only solidify and magnify the attachment concerns already observed.  It will make the eventual dislocation more traumatic and places great risk if she must later be assimilated into a permanent home.  Delaying the permanency of a family for [Cathy] for at least another year is committing serious mental health and emotional harm to this young child.  She can not wait for over another year for her father to get his life together, if he ever can.

[¶7] The record evidence supports these findings.  At the hearing Cliff conceded he has provided no financial support for Cathy and has had minimal contact or involvement with her since she was three months old.  Cliff testified, by his own estimate, it would be at least 21 months from the date of the hearing before he would be able to provide a home and parenting for Cathy.  Yet, Cliff argues Cathy will not suffer serious harm by waiting for him to assume his parenting responsibilities.  The record evidence belies Cliff’s argument.  

[¶8] Carol Paulson, a therapist with the Lake Region Human Service Center, testified that if Cathy has to wait another one and one-half years or more for a permanent home it could be seriously detrimental to her, because the disruption she would then experience in being taken away from her foster home attachments would be more traumatic.  Paulson testified that when Cathy is moved from foster care to a permanent home she is going to go through “a very difficult grieving separation” and the longer the move is delayed the more potential there is for long term serious emotional mental harm to Cathy.

[¶9] Susan testified that Cliff, even during Cathy’s first three months of life, was unable to provide primary care for Cathy.  Susan testified Cliff was violent to her in the infant’s presence and had threatened to take Cathy and hide her where Susan would never be able to find her.  Cliff’s uncaring and violent past actions while Cathy was in the parent’s home do not bode well for Cliff being able to provide the type of care and support Cathy needs now and will need in the future when he is released from prison.
(footnote: 1)
[¶10]  Cliff contends the juvenile court relied too heavily on Cliff’s imprisonment as a reason for terminating his parental rights.  We disagree.  Incarceration by itself does not establish abandonment of a child for purposes of terminating  parental rights.  
Matter of Adoption of J.W.M.
, 532 N.W.2d 372, 379 (N.D. 1995).  However, the probability of serious mental and emotional harm to a child may be established by prognostic evidence a parent’s current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent’s rights are not terminated.  
Matter of Adoption of P.R.D.
, 495 N.W.2d 299, 303 (N.D. 1993).  Parental rights do not spring full blown from the biological connection between parent and child, but require relationships more enduring, and noncustodial parents must not treat lightly their responsibilities toward their minor children.  
Matter of Adoption of J.W.M.
, 532 N.W.2d at 379.  In 1997 Cliff was well aware he was on parole from past criminal violations in Kentucky and subject to incarceration for violating the terms of his parole.  Nevertheless, he chose to commit felony terrorizing, thereby voluntarily placing himself in prison and rendering himself unable to provide financial or custodial care and support for his daughter.  His conduct demonstrates a serious indifference toward his responsibilities and obligations as a parent.  A casual display of interest by a parent does not overcome the significant effect of negligently failing to perform parental duties. 
Id.

[¶11] In terminating the parental rights of a father under similar circumstances, this court in 
In Interest of J.L.D.
, 539 N.W.2d 73, 77 & 79 (N.D. 1995), recognized the potential for serious harm in delaying placement of the child into a permanent adoptive home:

[The child] is already dangerously attached to his foster family . . . .  To make [the child] wait until an uncertain point in the future to begin adjusting to a new family would surely occasion an unreasonably severe dislocation from his existing emotional attachments.

[The father] also evades the grave problems implicit in making a deprived child assume the risks of waiting to see if a parent can turn his or her life around to become adequate for the parental role. . . .

. . . . 

Not surprisingly, [the child] has already developed strong emotional attachments with his foster family.  Continuing foster care indefinitely will only solidify and magnify these attachments, making his eventual dislocation more traumatic and placing his later assimilation into a permanent family at greater risk.  That is the serious mental and emotional harm that [the child] will probably suffer.

[¶12] At the time of the hearing in this case Cathy was two years old.  Requiring her to wait another 21 months, the minimal time period Cliff, himself, estimated he would need to be ready to take Cathy into his home and care for her, is a substantial period in such a young child’s life.  By the time Cliff might be “ready” to take custody of Cathy she would be at least four years old.  She would by then have experienced an extended period in her life of having no opportunity to bond with a permanent family.  After that significant period of only temporary attachments she would again have to be torn away to begin anew with someone she does not really know.  That process, according to the testimony, will be difficult enough now and perhaps severely harmful to Cathy if she is forced to wait nearly two more years for permanent placement.  We should not and cannot expect Cathy to wait or to assume the risk involved.  
See
, 
e.g.
, 
In Interest of C.K.H.
, 458 N.W.2d 303, 307 (N.D. 1990).

[¶13] Regarding a parent’s fundamental, but not absolute, natural right to a child, we cautioned in 
In Interest of F.H.
, 283 N.W.2d 202, 214 (N.D. 1979):

The rights of parents are not proprietary rights but rather are in the nature of a trust reposed in them, subject to their correlative duty to care for and protect the child.  The law secures their rights only so long as they shall discharge their obligations.  They are not to be enforced to the detriment or destruction of the happiness and well-being of the child.

[¶14] Having reviewed the entire record in this case, we conclude there is clear and convincing evidence Cathy is a deprived child and the causes and conditions of her deprivation are likely to continue for a sufficient time that by reason thereof Cathy will probably suffer serious mental or emotional harm if Cliff and Susan’s parental rights are not now terminated.  We, therefore, affirm the order of the juvenile court terminating Cliff and Susan’s parental rights and directing placement of Cathy in an adoptive home.  

[¶15] William A. Neumann

Mary Muehlen Maring

Carol Ronning Kapsner

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.

FOOTNOTES
1:    
Under our statutes, Cliff’s conduct has also created a substantial obstacle for his having custody of Cathy.  If the court finds a child is a deprived child, but does not terminate parental rights, the court, under N.D.C.C. § 27-20-44(2), can grant an order under N.D.C.C. § 27-20-30 for the custody of the child.  The court’s determination under that section of who should have custody requires the court to apply the “best interests of the child test” used for similar custody decisions under the divorce statutes.  
In Interest of D.G.
, 246 N.W.2d 892, 895 (N.D. 1976); 
see
 
also
 
Eastburn v. B.E.
, 545 N.W.2d 767, 771 (N.D. 1996).  For these custody decisions,  the court must evaluate the factors under N.D.C.C. § 14-09-06.2, and subsection j of that statute creates a rebuttable presumption that a parent who has perpetrated certain  domestic violence may not be awarded custody of the child.  The presumption arises under the statute if the court finds domestic violence has occurred “and there exists one incident of domestic violence which . . . involved the use of a dangerous weapon.”  Cliff’s act of threatening to kill Susan while holding a knife to her throat implicates the presumption.  Under the statute, the presumption can only be overcome “by clear and convincing evidence that the best interests of the child require that parent’s participation as a custodial parent.”  The burden would be difficult to overcome.