2017 ND 289

INTEREST OF K.S.D., a child

Jacqueline A. Gaddie, Assistant State's
Attorney, Petitioner and Appellee

v.

K.S.D., child; H.L.K., mother; Christo-
pher D. Jones, the Executive Director
of the North Dakota Department of
Human Services, Respondents

and

R.W.D., father, Respondent
and Appellant

Interest of J.S.D., a child

Jacqueline A. Gaddie, Assistant State's
Attorney, Petitioner and Appellee

v.

J.S.D., child; H.L.K., mother; Christo-
pher D. Jones, the Executive Director
of the North Dakota Department of
Human Services, Respondents

and

R.W.D., father, Respondent
and Appellant

No. 20170272, No. 20170273

Supreme Court of North Dakota.

Filed 12/7/2017

Jacqueline A. Gaddie, Assistant State's Attorney, Grand Forks, N.D., petitioner and appellee; submitted on brief.

Megan J.K. Essig, Grand Forks, N.D., for respondent and appellant; submitted on brief.

Louser, District Court Judge.

[¶ 1] R.W.D. appeals from a juvenile court order terminating his parental rights to his two children, K.S.D. and J.S.D. We conclude clear and convincing evidence es-

tablishes that the children are deprived, the deprivation is likely to continue, and the children have been in foster care at least 450 of the previous 660 nights. We also conclude active efforts to prevent the breakup of this Indian family were made and those efforts have been unsuccessful. However, we conclude there is nothing in the record to satisfy the Indian Child Welfare Act ("ICWA") requirement of evidence beyond a reasonable doubt, including testimony of a qualified expert witness, that continued custody by the parents would likely result in serious emotional or physical damage to the children. We retain jurisdiction and remand for testimony from an ICWA qualified expert witness.

I

[¶ 2] H.L.K. (mother) and R.W.D. (father) are the parents of K.S.D., born in 2009, and J.S.D., born in 2010. The family has been involved with Grand Forks County Social Services ("GFCSS") since October 2010. The children have been in foster care approximately half their lives. In June 2017, GFCSS filed a petition to terminate the mother's and the father's parental rights. The mother consented to termination, and the father's parental rights were involuntarily terminated by the juvenile court.

II

[¶ 3] The father asserts the evidence is insufficient to support a termination of his parental rights.

[¶ 4] This Court reviews "the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court." N.D.C.C. § 27–20–56. The juvenile court's decision will not be reversed on appeal unless the findings of fact are clearly erroneous under N.D.R.Civ.P. 52(a). A finding of fact is clearly erroneous

if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made. *Interest of K.J.,* 2010 ND 46, ¶ 5, 779 N.W.2d 635.

[¶ 5] Under N.D.R.Civ.P. 52(a), this Court does not re-weigh conflicting evidence, and gives due regard to the trial court's opportunity to judge the credibility of witnesses. *See Interest of J.S.L.,* 2009 ND 43, ¶ 12, 763 N.W.2d 783; *Brandt v. Somerville,* 2005 ND 35, ¶ 12, 692 N.W.2d 144. "A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court." *Brandt,* at ¶ 12. The court's findings should provide "sufficient specificity to enable a reviewing court to understand the factual basis for the trial court's decision." *Id.*

[¶ 6] When Indian children are involved in proceedings such as this, state and federal law create a dual burden of proof for the party seeking termination of parental rights. In addition to proving deprivation under state law by clear and convincing evidence, the state must prove beyond a reasonable doubt that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f); *see Matter of Bluebird,* 105 N.C.App. 42, 411 S.E.2d 820, 823 (1992). Below, we separately consider the state and federal law based elements of this termination proceeding.

A

[¶ 7] Under North Dakota law, the juvenile court may terminate parental rights if: (1) the child is deprived; (2) the conditions and causes of the deprivation

are likely to continue; and (3) the child is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(c); *In re C.R.*, 1999 ND 221, ¶ 4, 602 N.W.2d 520. "The party seeking parental termination must prove all elements by clear and convincing evidence." *Id.*

[¶ 8] Here, the juvenile court found GFCSS first had contact with the family in October 2010 in response to concerns of excessive alcohol use by the mother and father at Altru Hospital, following the premature birth of J.S.D. Following investigation of the incident, GFCSS made a finding of "services recommended," including a determination that the children were at "high risk." GFCSS made the high-risk determination based on the age of the children, the parents' substance abuse and legal issues, housing instability, relationship problems between the parents, and overall caring for the children.

[¶ 9] GFCSS implemented a safety plan which included a prohibition of the father supervising the children alone because he was unable to do so safely. Specifically, the father was not to hold J.S.D. because the father's history of alcohol abuse resulted in seizures.

[¶ 10] The family's second contact with GFCSS was in January 2011 after receiving a report of suspected child abuse and neglect. During a home check, a GFCSS social worker discovered that the father had been the caregiver to the children all day, which was outside of the safety plan. When the social worker arrived, the father was intoxicated to the point he could barely walk and his speech was slurred. This investigation resulted in a finding of "services required" based on a determination of physical neglect and maltreatment of vulnerable children. GFCSS subsequently provided the family with extensive services for problems related to domestic violence, alcohol and drug use, parenting, child's needs, stability, and employment.

[¶ 11] Shortly after the second contact with GFCSS, the father was incarcerated for physically assaulting the mother. The children were present during the assault, and K.S.D. is fearful of the father as a result. J.S.D. has no memory of the incident. The father had minimal contact with the children from February 2011 until November 2013. During this time, there were several reported incidents involving lack of supervision and exposure to drug paraphernalia while the children were in the care of the mother. In November 2013, the children were removed from the home because of the mother's continued drug use. Since then, the children have been in foster care for more than 1,300 days. K.S.D. and J.S.D., now six and seven, have been in foster care for approximately half of their lives.

[¶ 12] The father has made minimal efforts to maintain contact with the children, and has not seen them since summer 2015. Since the father's incarceration in 2011, GFCSS has encouraged the father to keep in contact with the children. It was mutually agreed between the children's father and GFCSS it was in the best interests of the children that they not visit him during his incarceration. However, GFCSS continuously encouraged the father to stay in contact through letters and participation in the social-service oriented family meetings via telephone. Over the last three and one-half years the father's contact with the children included (1) two written letters; (2) Christmas gifts sent from prison one year; and (3) at least one unsupervised visit during a temporary home placement with the mother.

[¶ 13] During his incarceration, the father participated telephonically in six out of the 15 child and family team meetings. Since being released from prison in No-

vember 2016, the father has participated in one family meeting, but otherwise has not made any efforts to be involved in the children's lives.

[¶ 14] The father does not have steady employment or an established residence. Despite claims of sobriety, the father has been uncooperative with GFCSS, refusing to sign the necessary releases to allow GFCSS to have access to his urinalysis results and sobriety information because he does not think they "need to be in the middle of it." During trial the father was unable to recall any of the children's psychological or medical issues. Additionally, the father testified he had not made any inquiry with social services concerning the children's medical providers or the children's medical treatment.

[¶ 15] Testimony was received from the court-appointed guardian ad litem, who was involved in the case as the children's advocate for nearly four years. The guardian ad litem testified the children were deprived, having been in care for 1,303 days. The guardian ad litem also testified the children had been abandoned and the children's best interests would be served by termination of parental rights so the children could be considered for adoption.

[¶ 16] On this record we conclude clear and convincing evidence exists supporting the juvenile court's findings that the children are deprived, the deprivation is likely to continue, continued custody by the parents would likely result in serious emotional or physical damage to the children, and termination of parental rights is in the children's best interest. The record also supports the juvenile court's finding that termination of parental rights was warranted because the children have been in foster care for at least 450 of the previous 660 nights.

B

[¶ 17] In addition to North Dakota's legal requirements for termination of parental rights, ICWA requirements must be met because K.S.D. and J.S.D. are "Indian children" as defined by the Act. 25 U.S.C. § 1903(4) (An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."); see also Interest of L.D.R.T., 391 N.W.2d 594, 598 (N.D. 1986). The party seeking termination of parental rights must demonstrate by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful. See 25 U.S.C. § 1912(d); 25 C.F.R. § 23.120.

[¶ 18] The Cheyenne River Sioux Tribe was properly notified of the proceedings and did not appear or provide a response to the proceedings in writing. The Tribe's ICWA coordinator spoke with GFCSS several times and indicated the Tribe did not plan to intervene. No evidence was provided that the children resided on tribal land, were wards of the tribe, or were under an existing tribal court order. 25 U.S.C. § 1911(a).

[¶ 19] Because of their ongoing psychological and medical needs, GFCSS was unable to place the children in a home meeting the requirements for priority placement under ICWA, resulting in the children being placed in a PATH (therapeutic) foster home. K.S.D.'s diagnoses include depression, anxiety, ADHD tendencies, conduct disorder, and an anxiety-related skin disorder. J.S.D.'s diagnoses include anger, PTSD, anxiety, bed-wetting and head-banging. In addition to the reported physical neglect and drug para-

phernalia exposure, reports exist of possible sexual assault of the children.

[¶ 20] Testimony was received from the court-appointed guardian ad litem, as well as Tammy Knudson and Kim Anderson of GFCSS, that active efforts were made to prevent the breakup of this Indian family, including, but not limited to: trial home placements, mental health evaluations, medical assistance, case management services, supervised visits, therapeutic visits, family and team group meetings, transitional assessments, in-home family therapy, mental health evaluations, medical assessments, transitional housing, drug and alcohol evaluations and treatment, public health services, respite care, infant development, in-home support through Easter Seals, and daycare services. Notification of child and family team meetings was provided the children's paternal grandmother, who did not complete the necessary steps to be considered a placement option. No other family member was identified by the father as a placement option. On the basis of the record we are satisfied active efforts to prevent the breakup of this Indian family, as required by 25 U.S.C. § 1912(d), were attempted and those efforts were unsuccessful.

[¶ 21] Title 25 of the U.S. Code, § 1912(f), addresses evidentiary requirements in proceedings to terminate parental rights to Indian children. That law provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

[¶ 22] As we discuss below, no ICWA "qualified expert witness" testified here as required by federal law. 25 U.S.C. § 1912(f). Although neither party raised the issue on appeal, federal law requires testimony by a qualified expert witness about whether the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *Id.* The State must prove this risk beyond a reasonable doubt. *Id.* Because the Petitioner did not provide testimony from a qualified expert witness that the continued custody of the children by the parent is likely to result in serious emotional or physical damage to the children, this ruling is subject to post-judgment invalidation under 25 U.S.C. § 1914. Were we to affirm the result in this case, even absent a proper objection, our affirmance would provide the children no certainty or stability because either parent or the tribe could collaterally attack the judgment at any time.

[¶ 23] Additional processes and burdens arise when an Indian child is the subject of the proceedings, but ICWA does not preempt state law. The Wisconsin Court of Appeals explained:

The ICWA does not preempt the Wisconsin Children's Code, and Wisconsin statutes can be harmonized with the federal law by applying any state law safeguards beyond those mandated by the ICWA. Thus, in a TPR proceeding involving an Indian child, the County must meet the substantive and procedural requirements of the ICWA, as well as proving the grounds for termination of parental rights as required by state law.

*In re Vaughn R.*, 2009 WI App 109, ¶ 18, 320 Wis.2d 652, 770 N.W.2d 795 (internal citations omitted); *I.P. v. State*, 166 Wis.2d 464, 470–74, 480 N.W.2d 234, 237–38 (Wis. 1992). Thus, "ICWA requires a specific finding for termination proceedings in addition to those required by state law and

imposes a separate burden of proof for that finding." *K.E. v. State*, 912 P.2d 1002, 1004 (Utah Ct. App. 1996).

[¶ 24] ICWA does not alter the requirements for state law proceedings, but instead requires an additional finding with a higher burden of proof in cases involving termination of parental rights to Indian children. The Utah court stated:

> The issue on which qualified expert testimony is required is the question of whether or not serious damage to the child is likely to occur. Therefore, the ICWA only requires the State to present qualified expert testimony on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home.

*Id.* (internal citation and quotation marks omitted). As a result, "for cases in which the ICWA applies, petitioners must prove the state law grounds for termination by clear and convincing evidence [under state law], and must prove the additional federal requirement beyond a reasonable doubt, *see* 25 U.S.C. § 1912(f)." *Id.* at 1005. The Utah court concluded, "The requirements for termination under state law and the additional requirement under federal law must each be met; however, those requirements are met under separate burdens of proof." *Id.*

[¶ 25] Under ICWA, the minimum federal standards apply to state "child custody proceedings," which include actions to terminate parental rights. *See* 25 U.S.C. § 1903(1)(ii). The stated legislative purpose of ICWA is:

> [T]o protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

25 U.S.C. § 1902; 25 C.F.R. § 23.3. In furtherance of this legislative purpose, ICWA imposes certain evidentiary burdens and requirements on state court proceedings, including:

> Prior to ordering an involuntary foster-care placement or termination of parental rights, the court must conclude that active efforts have been made to prevent the breakup of the Indian family and that those efforts have been unsuccessful.

25 C.F.R. § 23.120.

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f).

[¶ 26] Federal law does not define who may serve as a qualified expert witness, but provides:

> (a) A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

> (b) The court or any party may request the assistance of the Indian child's Tribe or the BIA office serving the Indian

child's Tribe in locating persons qualified to serve as expert witnesses.

(c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.

25 C.F.R. § 23.122. This regulation applies to any child custody proceeding initiated on or after December 12, 2016, even if the child has already undergone child custody proceedings prior to that date to which the regulation did not apply. See 25 U.S.C. § 1903(1); 25 C.F.R. § 23.2.

[¶ 27] Here, the two primary witnesses were employed by GFCSS. The district court found, "Tammy Knudson and Kim Anderson of GFCSS were both qualified as experts in the field of child deprivation and child welfare." Each provided both factual and opinion testimony, but it is undisputed that neither was presented as or testified as a "qualified expert witness" within the meaning of ICWA. Furthermore, the plain terms of the federal law strongly suggest neither Knudson nor Anderson could be an ICWA qualified expert witness. See 25 C.F.R. § 23.122(c) ("The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.").

[¶ 28] The lack of qualified expert testimony on whether the continued custody of the child by the parent or Indi-

an custodian is likely to result in serious emotional or physical damage to the child leaves this record without evidence necessary for the district court to find the State established the ICWA requirement by proof beyond a reasonable doubt.[1] 25 U.S.C. § 1912(f). There is a line of authority that upholds termination of parental rights absent an ICWA qualified expert witness. We choose to follow the other branch of authority because the United States Code and the United States Code of Federal Regulations require—and do not merely suggest—that a qualified expert witness testify on the ICWA requirements in all ICWA terminations. See In re Vaughn R., 2009 WI App 109, ¶ 52, 320 Wis. 2d 652, 770 N.W.2d 795 (trial court reversed because the record did not support a basis for concluding county social worker was "qualified expert witness" under 25 U.S.C. § 1912(f)); see K.E. v. State, 912 P.2d at 1004–05 (case reversed and remanded to trial court for finding on the ICWA factor). We also do so to avoid future uncertainty for the children if the father or another party later seeks to invalidate this termination. See 25 U.S.C. § 1914 ("Any ... parent .... from whose custody [any Indian] child was removed ... may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."). See also BIA Guidelines for

---

1. We have been pointed to nothing in the record suggesting the district court was briefed on the ICWA requirement for testimony from a qualified expert witness on the issue of whether the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. We agree with the concurring opinion in Utah stating:

It seems to me a safe presumption that the trial judge, had he been given an opportunity to consider the impact of the ICWA on this case, would have taken appropriate

corrective action without the need of direction from this court. Prompt and formal application to the trial court would have saved considerable expense, time, and difficulty for all involved. It also would have served the best interests of the two children, whose future is at issue in this case, by allowing resolution of this question one year earlier than has been possible through the mechanism of an appeal.

K.E. v. State, 912 P.2d at 1005 (Wilkins, J., concurring).

Implementing the Indian Child Welfare Act at 75–76 (December 2016) ("A party may assert violations of ICWA requirements that may have impacted the ICWA rights of other parties (*e.g.*, a parent can assert a violation of the requirement for a Tribe to receive notice under section 1912(a))," and a "petition to invalidate an action does not necessarily affect only the action that is currently before the court. For example, an action to invalidate a TPR may affect an adoption proceeding.").

### III

[¶ 29] No evidence exists in this case upon which we can conclude either Ms. Knudson or Ms. Anderson or any other witness could or did testify about "the prevailing social and cultural standards of the Indian child's Tribe." 25 U.S.C. § 1912(f); 25 C.F.R. § 23.122(a). As a result, we retain jurisdiction under N.D.R.App.P. 35(a)(3) and remand this matter to the district court for a hearing only on the ICWA requirement discussed in this opinion. The mandate under N.D.R.App.P. 41 shall issue forthwith. After the mandate issues, the district court shall conduct further proceedings in accordance with this opinion within 45 days. *See O'Hara v. Schneider,* 2017 ND 53, ¶ 29, 890 N.W.2d 831. Because a different district court judge will decide the ICWA issue on remand, the new judge must comply with N.D.R.Civ.P. 63. The new judge may, consistent with this opinion, hear new evidence and conduct further proceedings as he or she deems necessary.

[¶ 30] Stacy J. Louser, D.J.

Daniel J. Crothers

Jerod E. Tufte

[¶ 31] The Honorable Stacy J. Louser, District Judge, sitting in place of Jensen, J., disqualified.

VandeWalle, Chief Justice, concurring and dissenting.

[¶ 32] I concur in parts I and II A of the majority opinion. I respectfully dissent to Part II B of the opinion and I would therefore affirm.

[¶ 33] The majority at ¶ 22 acknowledges that although neither party raised the issue on appeal, there is an issue regarding federal law and the requirement of a "qualified expert witness." Without much more than a nod to the jurisprudence governing appeals to our Court, the majority proceeds to address the issue and reverse the trial court's decision even though the issue was not raised in the trial court or on appeal. "Arguments not made to the district court will not be considered on appeal." *Hallin v. Inland Oil & Gas Corporation,* 2017 ND 254, ¶ 16, 903 N.W.2d 61, citing *Fahey v. Fife,* 2017 ND 200, ¶ 11, 900 N.W.2d 250; *Interest of L.D.R.T.,* 391 N.W.2d 594, 601 (N.D. 1986). This is a civil case and we do not apply the obvious error jurisprudence developed under N.D.R.Crim.P. 52(b) (obvious error affecting substantial rights may be considered even though not brought to the court's attention). On the other hand, Rule 61 of the North Dakota Rules of Civil Procedure does establish a harmless error rule that at every stage of the proceeding, the court must disregard errors and defects that do not affect any substantial rights.

[¶ 34] Nevertheless, I understand the majority's concern that under 25 U.S.C. § 1914, the district court's decision is subject to collateral attack at any time because of the lack of a "qualified expert witness." While theoretically true, the risk of a successful attack is, at best, dim. The tribe in this case was notified and did not appear and under the facts of this case, as outlined in the majority opinion, it is incomprehensible to even suggest the "quali-

fied expert witness" could conclude that the continued custody of the children by the parent would not be likely to result in serious emotional or physical damage to the children. If there was such a possibility, I might have joined the majority opinion because of the uncertainty created by the federal law. Under the facts of this case I would adhere to our appellate jurisprudence.

[¶ 35] Because the issue addressed by the majority was not raised below or on appeal and, even more significantly, because of the facts underlying the district court's decision in this case, I would affirm the district court judgment terminating the parental rights of R.W.D. If ever there was a case of form over substance this is such a case. Rather than encouraging adherence to ICWA, it is decisions like this that breed disrespect for the laudable goals of ICWA.

[¶ 36] Gerald W. VandeWalle, C.J.

Lisa Fair McEvers